## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Javece Wilson, | Case No. 21-cv-367 (PAM/HB) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| Warden J. Fikes and DOJ, | |
| Respondents. | |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Petitioner Javece Wilson's Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2241 [ECF No. 8] and his filing on April 16, 2021, which the Court has construed as a Motion to Amend [ECF No. 13] (hereafter the "Motion to Amend"). The Court has also taken into consideration the materials Wilson filed in support of his Motion to Amend and other supplemental filings [ECF Nos. 16, 17, 20, 21]. The Court respectfully recommends that both the Petition and Motion to Amend be denied on the merits.[1]

## I.    Background

Wilson is currently incarcerated at the Federal Correctional Institution in Sandstone, MN. DeLoia Decl. ¶ 7 [ECF No. 11]. This matter arises out of an incident that occurred on March 21, 2020, when a prison officer discovered contraband in a locker. *Id.* ¶ 9.

---

[1] Petitioner has also filed a Motion to Expedite these proceedings. [ECF No. 23.] The Court will address that motion in a separate order.

Although Wilson contends the locker was not assigned to him (*see, e.g.*, April 19 Letter at 6[2] [ECF No. 16]; May 6 Reply at 1 [ECF No. 21]), Mark DeLoia, the Discipline Hearing Officer (DHO) assigned to this incident, attests that the locker was registered to Wilson (DeLoia Decl. ¶¶ 6, 9).  Inside the locker were envelopes and mailing labels bearing Wilson's name, and inside the envelope(s) were four pieces of white paper that appeared to be "saturated with an unknown substance." *Id.* ¶ 9.  The officer sent the papers to the Lieutenant's office where they were analyzed using a NIK test which revealed the presence of amphetamines on the papers.  The incident was documented in an incident report and Wilson received a copy of the report later that same day.  *Id.*; Govt. Ex. D (hereafter "Incident Report") [ECF No. 11-4].  At that time, Wilson was advised of his rights and he stated, "I'm reporting this because it is untrue.  I don't sell narcotics. I've never seen those strips of paper."  DeLoia Decl. ¶ 10.  The incident was then referred to the Unit Disciplinary Committee (UDC) for a hearing.  *Id.*

On March 24, 2020, the UDC conducted a hearing at which Wilson stated he was "not guilty."  *Id.* ¶ 11.  The UDC referred the incident to Officer DeLoia for a disciplinary hearing, advised Wilson of his rights during that proceeding, and gave him an opportunity to request witnesses and a staff representative.  *Id.*  Wilson initially requested a staff representative, but later waived the right.  *Id.* ¶¶ 11–12.  He also requested inmate "K.R." act as a witness for him.  *Id.* ¶ 11.

Officer DeLoia conducted the DHO hearing on April 16, 2020.  *Id.* ¶ 13.  At the

---

[2] Because the filings lack internal pagination, the Court cites to the page numbers generated by the CM/ECF system (printed in the upper right corner of the document).

hearing Wilson again stated that he was "not guilty," but he apparently did not present any evidence in his defense, challenge the NIK testing procedure or the qualifications of the staff member who conducted it, or assert that the locker in question was not his locker. *Id.* ¶¶ 14, 17. Because of modified operations due to the COVID-19 pandemic, K.R. was not able to appear at the hearing in person, but he gave the following written statement: "[Wilson] was joking with some friends outside K unit and [an] officer approached him for no reason. That is all I know." *Id.* ¶ 14.

Based on the evidence before him, Officer DeLoia found Wilson violated Code 113, Possession of Drugs. DeLoia Decl. ¶ 15; Govt. Ex. H (hereafter "DHO Report") [ECF No. 11-8]. DeLoia issued several sanctions, including, as relevant here, a disallowance of 41 days of good conduct time. DeLoia Decl. ¶ 14. Officer DeLoia published a report of his findings on May 19, 2020. DHO Report at 4.

Wilson first filed a petition for habeas corpus on February 5, 2021. [ECF No. 1.] The Court found that petition to be too broad and too ill-defined to expect Respondents to prepare a reasoned response to the claim, so it directed Wilson to submit an amended habeas petition within 30 days, providing a more definite statement of his claim for relief. [ECF No. 6.] Wilson did so, so the operative pleading in this case is Wilson's amended petition. [ECF No. 8.]

On April 16, 2021, Petitioner filed a document that begins "I'm asking to add to my existing file case no. 21-cv-00367." [ECF No. 13.] The Court construed this document as a Motion to Amend and set a briefing schedule on the motion. Petitioner then submitted several letters in support of his Petition and/or Motion to Amend [ECF

Nos. 16, 17, 20], as well as a reply to the response to his motion [ECF No. 21]. The Court has reviewed these submissions. They are largely duplicative of each other and somewhat difficult to follow. The Court addresses the allegations by topic, rather than by filing, but endeavors to cite to all the relevant filings where possible.

## II.    Discussion

### A.    Scope of the Writ

"The writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The essence of a habeas petition is an attack by a person in custody upon the legality of the custody. *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Habeas corpus relief is not limited to immediate release from illegal custody, as the writ is available to obtain future releases, like shortening the length of actual confinement. *See Preiser*, 411 U.S. at 487. A § 2241 habeas petition is the proper way to challenge sanctions that affect the length of an inmate's detention. *Id.* However, to the extent the inmate is challenging sanctions that do not affect the length of the detention, a habeas petition is not the proper remedy. *Kruger*, 77 F.3d at 1073.

Wilson's filings make it clear that the primary relief he seeks relates to his claim that his prison sentence was unconstitutionally lengthened by virtue of his losing 41 days of good conduct time. That is a cognizable claim in a § 2241 habeas petition. *See Preiser*, 411 U.S. at 487. However, Wilson seems to be seeking additional relief, such as to have the incident "removed off [his] character history" (Am. Pet. at 4) or to have his

"case overturned, reversed" (Reply Addendum [ECF No. 21-1]).  At other points, Wilson

calls the Court's attention to the conditions of the unit where he was living, which he

believes violated certain safety standards.  *E.g.*, April 19 Letter at 6; May 6 Reply at 2, 4.

A habeas petition is not the appropriate vehicle to raise these claims.  *Kruger*, 77 F.3d at

1073 ("It is the substance of the relief sought which counts.  Where petitioner seeks a

writ of habeas corpus and fails to attack the validity of his sentence or the length of his

state custody, the district court lacks the power or subject matter jurisdiction to issue a

writ.")  Insofar as Wilson's petition seeks such relief, the Court lacks jurisdiction to

review the claims.  Accordingly, it will recommend dismissal on these points.

Additionally, the Amended Petition names J. Fikes, the Warden at FCI Sandstone,

and the Department of Justice (DOJ) as Respondents.  The writ is properly directed to

Warden Fikes as the "person having custody of the person detained," but the DOJ is not a

proper party.  28 U.S.C. §§ 2242, 2243; *see also Rumsfeld v. Padilla*, 542 U.S. 426, 434–

35 (2004).  The Court therefore recommends dismissing the DOJ from this matter.

### B.    Wilson's Original Claims

Wilson's initial challenge centered on whether the discipline hearing violated his

due process rights.  Since the deprivation of good conduct time implicates a liberty

interest, a prisoner must be afforded minimum due process.  *See Superintendent, Mass.*

*Corr. Inst. v. Hill*, 472 U.S. 445, 453 (1985).  Wilson challenges several aspects of the

Respondents' investigation of the incident and subsequent hearing, so the Court liberally

construes the Petition to allege both procedural and substantive violations.  The Court

turns first to Wilsons's procedure-based claims.

### 1.    Procedural Due Process

An inmate subject to the loss of good conduct time as a disciplinary sanction is afforded due process when he receives: "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institution safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Hill*, 472 U.S. at 454; *see also Wolff v. McDonnell*, 418 U.S. 539, 563–67 (1974); *Dible v. Scholl*, 506 F.3d 1106, 1110 (8th Cir. 2007).

### a.    Advance Written Notice of the Charges

The first requirement of procedural due process is that the inmate receive advance written notice of the disciplinary charges. The advance written notice must be adequate to enable an inmate to marshal the facts and prepare a defense. *Wolff*, 418 U.S. at 564; *Freitas v. Auger*, 837 F.2d 806, 809 (8th Cir. 1988). The written notice should also provide the inmate notice of at least some of the specific facts underlying the accusation. *Dible*, 506 F.3d at 1110. In this case, Wilson received a copy of the incident report on March 21, 2020—the same day as the search—describing the incident. DeLoia Decl. ¶ 9; Incident Report at 1. Among other things, the report describes the search of the locker and the evidence that the locker belonged to Wilson, as well as the process by which the strips of paper were tested for amphetamines. Incident Report at 1. The report also bears the date and time it was delivered to Wilson, as well as the signature of S. Jacobson, the officer who delivered the incident report to Wilson. *Id.*

Wilson argues that Respondents' process did not satisfy the first *Hill* requirement

because he was not also provided with a copy of the evidence against him. *See* Am. Pet. at 1 ("I wasn't even provided any access to evidence no copies supplied to me to prepare my defense."); *id.* at 3 ("I never seen any evidence."); April 19 Letter at 2 ("How was I able to prepare for incident hearing without knowing any evidence in which hinder me from preparation"); *id.* at 4 ("During the hearing I would of argued that I seen the paper with no names on it if I seen it"); May 6 Reply at 1 ("I never seen copies of paper in incident report nor was given a copy of it"). However, the Supreme Court has made it clear that due process is satisfied when a petitioner receives advance *notice* of the disciplinary charges against him and a *description* of the evidence to be relied upon. *See Hill*, 472 U.S. at 454; *Wolff*, 418 U.S. at 564–65. Nothing in *Hill* or *Wolff*, or in any other case this Court has found, suggests that he is entitled to receive copies of the evidence itself in advance of the hearing. On the contrary, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff*, 418 U.S. at 556.

The Court has reviewed the incident report and has determined that it sufficiently describes the specific facts and evidence underlying the charge, such that Wilson was able to prepare his defense. This process satisfies the first *Hill* requirement.

### b.    Opportunity to Call Witnesses and Present Evidence

Wilson also disputes that he was given an opportunity to call witnesses and present evidence in his defense, in violation of the second *Hill* requirement. *See, e.g.*, Am. Pet. at 2 ("I wasn't able to have my witness present at hearing or present my documentary evidence."); April 19 Letter at 2 ("I was denied due process with my

witness not being able to be present either.").

This claim is not supported by the record. The record is clear that Wilson was advised of his rights ahead of the DHO hearing—including his right to present documentary evidence—and was given an opportunity to request witnesses and have a staff representative assist him. DeLoia Decl. ¶ 11; Incident Report at 2. The Inmate Rights at Discipline Hearing form—which Wilson signed to acknowledge receipt— explicitly informed him that he had the right to call witnesses and present evidence in his defense, so long as institutional security would not be jeopardized. Govt. Ex. E ¶ 3 [ECF No. 11-5]. To the extent Wilson claims he was prevented from marshaling a defense, it was not due to lack of awareness of his rights.

It is possible that Wilson's claim is that he was aware of his rights but was stymied in exercising them. But even if that is the correct interpretation, Wilson's claim fares no better. As to presenting evidence, Wilson does not elaborate on what "documentary evidence" he intended to present at the hearing, or in what way he was prevented from using it. Wilson was given the opportunity to present evidence at the hearing, and he made the following statement: "Not guilty." DeLoia Decl. ¶ 14; DHO Report at 1. There is nothing before the Court that would indicate Wilson had documentary evidence to offer at the hearing but was unable to offer it.

As to witnesses, the record is more developed. Wilson asked that a fellow inmate, K.R., appear as a witness on his behalf. DeLoia Decl. ¶ 11; Govt. Ex. F [ECF No. 11-6]. However, K.R. was unable to testify in person, since, due to the COVID-19 pandemic, inmates from different areas of the prison were not permitted to have contact with one

another. DeLoia Decl. ¶ 14; DHO Report at 2. Instead, K.R. submitted the following written statement: "He was joking with some friends outside K unit and [an] officer approached him for no reason. That is all I know." DHO Report at 2.

An inmate is permitted to call witnesses in his defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566. In particular, witnesses may be unavailable if the DHO determines that the witness's presence would jeopardize institution security. 28 C.F.R. § 541.8(f)(3). If a witness is unavailable, the DHO may rely on written statements instead. 28 C.F.R. § 541.8(f)(4).

Here, prison officials had concluded that permitting prisoners from different parts of the prison to interact with each other would increase the risk of transmission of COVID-19. Wilson does not argue that determination was wrong or unlawful and the Court has no basis to question second-guess that decision. The substitution of K.R.'s written statement is justifiable under the circumstances. 28 C.F.R. §§ 541.8(f)(3) and (4). Furthermore, Wilson does not identify any testimony that K.R. would have offered had he been able to appear in person that he was unable to include in his written statement.[3]

_____

[3] Wilson appears to argue that there is a second witness who could testify that officers harassed Wilson in the course of searching his locker. Mot. Am. at 2 ("I have a witness of another prison witness me getting harassed and shook down before cell being searched in the hallway no cameras can see."). As already noted, Wilson was given the opportunity to call witnesses at his hearing, subject to the limitations imposed by the COVID-19 pandemic. He relied on the written testimony of one such witness. *See* DeLoia Decl. ¶¶ 11, 14. Nothing in the record suggests that he asked for but was denied the opportunity to submit a written statement from a second witness. Wilson cannot now raise, apparently for the first time, his desire to have a second witness testify.

Several times in his submissions, Wilson argues the proceedings were invalid because he was not provided with legal counsel (Am. Pet. at 1; April 19 Letter at 1, 2) and/or because he could not manage his own defense due to the effects of a traumatic brain injury (April 19 Letter at 3). Because this allegation relates to Wilson's ability to mount a defense, the Court considers it in connection with the second *Hill* factor. The Supreme Court has said that "inmates do not have a right to either retained or appointed counsel in disciplinary hearings." *Baxter v. Palmigiano*, 425 U.S. 308, 315 (1976). As the Court has already noted, the Supreme Court has held that because prison disciplinary proceedings do not equate to criminal prosecution, "the full panoply of rights due a defendant in such proceedings does not apply." *Wolff*, 418 U.S. at 556; *see also Hill*, 472 U.S. at 455–56. However, in certain circumstances, such as where the inmate is illiterate or the case is particularly complex, such that it is "unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case," the Supreme Court has provided that the accused can "seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff." *Wolff*, 418 U.S. at 570.

Wilson's filings with the Court demonstrate that he is not illiterate, and the case against him was not unusually complex. Furthermore, nothing in the record indicates that he told prison authorities that he was unable to comprehend the proceedings or act in his own defense. On the contrary, Wilson was provided with the opportunity to enlist a staff member of his choice to act as his representative, and while he initially requested that W. Rubesh, a Warehouse Worker Foreman, serve as his staff representative, he later waived

Rubesh's assistance. DeLoia Decl. ¶¶ 11–12; Govt. Ex. F, Gov. Ex G [ECF No. 11-7].

He was not entitled to further assistance beyond what he was offered.

Accordingly, the Court concludes this process satisfies the second *Hill*

requirement.

### c.    Written Statement of the Evidence and Reasoning

The third *Hill* requirement is that Wilson be provided with a written statement by

the factfinder describing the evidence relied on and the reasons for the disciplinary

action. Wilson disputes that this occurred. *See, e.g.*, April 19 Letter at 1 ("DHO hearing

saying I received a copy on June 1, 2020 is false"). However, the record before the Court

shows otherwise. Officer DeLoia issued a report on May 19, 2020, describing the

reasons for the disciplinary action and the evidence he relied on in making his

determination. DeLoia Decl. ¶¶ 13, 16; DHO Report. That report was delivered to

Wilson by T. Barden on June 1, 2020, and Wilson signed the form to acknowledge

receipt. DHO Report at 4. Wilson's self-serving allegation—contrary to the evidence—

is not sufficient to trigger habeas relief. *See Hewlett v. Kallis*, Case No. 19-cv-1123

(WMW/LIB), 2020 WL 1359679, at *11 (D. Minn. Jan. 7, 2020), *report and*

*recommendation adopted*, 2020 WL 1333134 (D. Minn. Mar. 23, 2020) (quoting *Jackson*

*v. Swarthout*, Case No. 2:10-cv-0494-GEB-EFB P, 2016 WL 3197373, at *7 (E.D. Cal.

June 8, 2016); *Stanciel v. Holinka*, Case No. 06-cv-3730 (PJS/SRN), 2008 WL 304889,

at *4 (D. Minn. Jan. 8, 2008) *report & recommendation adopted* (D. Minn. Jan 21, 2008).

Because Wilson was provided with a written statement by the factfinder describing the

evidence relied on and the reasons for the disciplinary action, the DHO process has

satisfied the third *Hill* requirement.

Accordingly, the Court concludes that the procedures employed here satisfied procedural due process.

### 2. Substantive Due Process

The Court also understands Wilson to allege a substantive due process violation, so it turns to that claim next. Prison officials have discretion to impose disciplinary sanctions, and the Court is only permitted to review such decisions when they amount to "an unreasonable or arbitrary exercise of such discretion." *Glouser v. Parratt*, 605 F.2d 419, 420–21 (8th Cir. 1979). Moreover, "inmates' interests must be balanced . . . with the government's interest in assuring inmates' safety and in avoiding burdensome administrative requirements that might be susceptible to manipulation." *Brown v. Nix*, 33 F.3d 951, 954 (8th Cir. 1994) (quotations omitted). Although decisions to revoke good time credits must be supported by some evidence, the question for the Court is "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455–56 ("Revocation of good time credits is not comparable to a criminal conviction . . . and neither the amount of evidence necessary to support such a conviction . . . nor any other standard greater than some evidence applies in this context.").

Wilson asserts several challenges to the evidence on which the discipline hearing decision against him was based. Specifically, Wilson alleges (1) the rapid test used to analyze the substance on the papers was inaccurate or insufficient (*see* Am. Pet. at 1–2; Mot. Am. at 1; April 19 Letter at 2, 6; May 6 Reply at 1); (2) staff conducting the drug

test were untrained (Am. Pet at 2; April 19 Letter at 1, 2); (3) he wasn't provided access to "scientific and lab testing"—presumably to analyze the substance on the paper strips himself (Am. Pet. at 1); (4) the chain of custody of who handled the paper strips is unclear (Am. Pet. at 2); (5) pictures of the contents of the locker are not labeled with Wilson's name (April 19 Letter at 1, 2); (6) there are discrepancies as to whether the locker was secured or unsecured at the time of the incident (April 19 Letter at 1); (7) his fingerprints were not found on the items in the locker (April 19 Letter at 2); (8) the locker was not assigned to him (Am Pet. at 3; April 19 Letter at 6; May 6 Reply at 1); and (9) the Respondents have "failed to provide sufficient evidence that [Wilson] was in control of narcotics" at all (Am. Pet. at 3).[4]

The Court has considered these allegations in the context of the evidence Officer DeLoia considered in reaching his decision, including "the incident report, memoranda from the Lieutenant who tested the paper and officer who conducted the search, and the photo sheet showing the paper and NIK testing results." *See* DeLoia Decl. ¶ 16; DHO Report. Among other things, the DHO specifically noted that, according to the incident report, the locker was secured at the time of the search and was registered to Wilson on the sentry roster. DHO Report at 3. Four pieces of paper were found inside an envelope which also contained "several address labels with inmate Wilson's Reg. No. on them and also a commissary receipt with his name and number on it." *Id.* The reporting officer

---

[4] Certain of these allegations only appear in Wilson's Motion to Amend or later filings, so they are not technically aspects of his original pleading. The Court considers them here, alongside the claims in Wilson's Amended Petition, because they are thematically connected.

also described the process he followed to test the substance on the papers, which Officer

DeLoia affirms was "the correct NIK testing sequence." *Id.*; DeLoia Decl. ¶ 9.

Specifically, the strips in test A, when mixed with the testing solution, showed an

immediate orange color solution that turned to a brown color. DHO Report at 3.

According to the Polytesting Chart, this color result indicated that the tester should

conduct the NIK Test U. *Id.* When the officer did so, "the substance inside the test kit U

turned maroon in color, which indicates a positive result for amphetamines." *Id.*

Although this recitation does not necessarily address every concern Wilson raises,

it is a more than sufficient basis to support the conclusion reached by the disciplinary

board. *Hill*, 472 U.S. at 455–56. The Court has no reason to conclude that the DHO's

decision involved "an unreasonable or arbitrary exercise" of discretion. *Glouser*, 605

F.2d at 420–21. Instead, in view of the record, the Court finds there is "some evidence"

to support the conclusion reached by the DHO that Wilson had violated Code 113,

Possession of Drugs, which is all that is required by *Hill*.

At various points, Wilson also seems to challenge the admissibility of the papers

that gave rise to the discipline proceedings, arguing that the search of his locker was

intended to harass him and violated his rights under the Fourth Amendment. *See* Am.

Pet. at 4; Mot. Am. at 1; May 6 Reply at 1. The Supreme Court has made it clear that

prison inmates do not have a subjective expectation of privacy in their cells, and

therefore, "the Fourth Amendment proscription against unreasonable searches does not

apply within the confines of the prison cell." *See Hudson v. Palmer*, 468 U.S. 517, 526

(1984). Although here the contraband was found in Wilson's locker, not his cell, the

14

Supreme Court's reasoning—that a prisoner's right of privacy in their belongings cannot be reconciled with the needs and objectives of penal institutions—still applies. *See id.* Since Wilson did not have an expectation of privacy in the belongings in his locker, the Fourth Amendment is not implicated and the DHO could therefore appropriately consider the paper found in the locker as evidence.

Accordingly, finding neither a procedural nor a substantive due process violation, the Court recommends denying the Amended Petition on due process grounds.

### C.    Motion to Amend and Subsequent Filings

#### 1.    Due Process

Wilson's Motion to Amend and subsequent letters reiterate his due process concerns.  For the reasons provided above, the Court does not conclude the disciplinary process here violated due process on either procedural or substantive grounds.  To the extent Petitioner seeks to amend his pleading to incorporate any of the above-mentioned claims, the Court finds the amendment would be futile, and recommends denying the motion as to those claims.

#### 2.    Equal Protection

In his Motion to Amend and later filings Wilson seeks to incorporate an equal protection claim, asserting that he was treated unfairly on account of his race. *See, e.g.*, Mot. Am. at 1 ("I was treated different to others in prison based on preferential treatment and was targeted."); April 19 Letter at 5 ("It's not my fault I'm black and all these officers has hidden prejudice or racism acts.").  To allege a violation of equal protection rights, a claimant must show that he is a member of a protected class and that a

fundamental right was violated, or that a similarly situated class of inmates are treated differently, and this different treatment bears no rational relation to any legitimate penal interest. *See* U.S. Const. amend. XIV; *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998). In either case, the inmate must also show intentional or purposeful discrimination. *Klinger v. Dep't of Corr.*, 31 F.3d 727, 733 (8th Cir. 1994).

Wilson argues the DHO has "reduced, dismissed, or expunged other inmates' incident reports as a report, so I'm treated differently because I'm black." April 19 Letter at 3. As evidence, Wilson provides the Court with the first pages of two incident reports—his own, and that of another, unnamed inmate from April 2021—which he seems to believe are proof of disparate treatment. April 23 Letter [ECF No. 17]; Pl.'s Ex. 1 [ECF No. 17-1]. Insofar as Wilson offers the two reports as evidence that he was treated differently on account of his race, the Court observes that the report does not disclose the second individual's race or ethnicity. More importantly, the two reports do not support Wilson's perception that he was treated differently.

The other incident report describes an event with a similar fact pattern to the one here: officers searched the inmate's locker and discovered a piece of paper that was saturated with an unknown substance. Pl.'s Ex. 1 at 1. The officer conducted NIK testing on the paper and the paper turned orange and then brown, which the report writer noted "indicates a positive presence of Amphetamine-Type compounds." *Id.* Then, just as in Wilson's case, the officer proceeded to conduct the NIK Test U and the substance turned maroon in color. *Id.* The report writer observed that the result "indicates a negative result for Methamphetamines. This concludes the paper contained a narcotic

substance." *Id.* This phrasing is confusing and, at first blush, contradictory to the conclusion reached in Wilson's case since in Wilson's incident report the officer observed the NIK Test U turn maroon and then concluded it "indicate[d] a positive result for amphetamines." Both tests turned maroon, but while the other inmate's results were characterized as "negative," Wilson's results were considered "positive."

The Court begins by clarifying terms. Amphetamine is the name of a broad class of stimulant drugs, of which methamphetamine is a derivative. *See* John R. Richards & Erik G. Laurin, *Methamphetamine Toxicity*, Nat'l. Ctr. for Biotechnology Info. (Nov. 20, 2020), https://www.ncbi.nlm.nih.gov/books/NBK430895/. Respondents represent that the NIK Test U is designed to be sensitive to this difference, such that it turns maroon when it detects amphetamines and turns blue when it detects methamphetamines. The NIK test is conducted in a two-step process wherein the first step (where the substances went from orange to brown) indicates the presence/absence of an amphetamine and the second step (where the substance turned maroon) indicates the presence/absence of methamphetamine. The reports are worded differently, but reached the same conclusion: in both cases the papers contained amphetamines (as indicated by the first test) but did not contain methamphetamine (as indicated by the second test). *Compare* Pl.'s Ex. 1 at 1 ("This color result indicates a positive presence of Amphetamine-Type compounds . . . [and] a negative result for Methamphetamines") *with* Pl.'s Ex. 1 at 2 ("[T]he substance inside test kit U turned maroon in color, which indicates a positive result for amphetamines."). More to the point, there is nothing in the report for the second inmate that suggests he was treated differently from Wilson on account of the test results, much

17

less that any differential treatment was based on race or ethnicity.  The Court therefore concludes that the second incident report does not support Wilson's contention that he was denied equal protection.

Wilson has presented no evidence that he was treated differently or that any difference in treatment was motivated by his membership in a protected class.  There is no evidence to support a finding that Wilson's sanctions amounted to an equal protection violation.  Accordingly, any motion to amend the pleading to include such claims would be futile.  The Court recommends denying his motion to amend on this point.

### 3. Eighth Amendment

Finally, Wilson seeks to add certain claims arising under the Eighth Amendment. *See, e.g.*, April 19 Letter at 5 ("This is cruel punishment no fair treatment no 8th Amendment fairness."); April 28 Letter at 1 [ECF No. 20] ("I wanted to include 8th Amendment for wrongful confinement in segregation for 50+ days and 41 days taken away.").  These allegations are entirely conclusory and largely duplicative of Petitioner's due process claims.  For the reasons described above, the Court finds that any such claims would be futile and recommends denying Wilson's Motion to Amend to add this claim.

## III. Conclusion

The Court finds that Wilson's disciplinary proceedings were constitutionally adequate.  It also finds that deducting Wilson's good credit time was supported by some evidence and was not unreasonable or arbitrary.  Likewise, the Court believes that Wilson's Motion to Amend would be futile, as Wilson has not made a viable claim under

the Eighth Amendment or the Equal Protection Clause of the Fourteenth Amendment. The other sanctions Wilson received do not affect the length of his detention and are therefore not reviewable here.

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that

- Petitioner Javece Wilson's Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2241 [ECF No. 8] be **DENIED** in its entirety, and

- Wilson's Motion to Amend [ECF No. 13] be **DENIED** on the ground of futility.

Dated: May 18, 2021                        *s/ Hildy Bowbeer*
                                           HILDY BOWBEER
                                           United States Magistrate Judge


## NOTICE

The Court's Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).